IN THE UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF MARYLAND

| | | |
|---|---|---|
| UNITED STATES OF AMERICA | * | |
| | * | |
| v. | * | CRIMINAL NO. JRR-22-248 |
| | * | |
| DUANE WATTS, | * | |
| | * | |
| Defendant. | * | |
| | * | |
| ******* | | |

**<u>GOVERNMENT'S MEMORANDUM IN AID OF SENTENCING</u>**

The United States of America hereby submits this memorandum in aid of sentencing. As set forth below, the government respectfully requests that the Court sentence the Defendant, Duane Watts ("Watts" or "Defendant") as follows:

- A total sentence of 57 months imprisonment. This consists of 33 months for Count One (Conspiracy to Commit Wire Fraud), followed by a consecutive 24-month sentence as to Count 15 (Aggravated Identity Theft);

- Supervised Release for a period of three years; and

- Restitution, per the plea agreement, in the amount of $167,775.[1]

**I.   The Defendant's Crimes**

This Defendant's criminal conduct was serious, long lasting, and involved repeatedly taking advantage of government legislation intended to help individuals in need during a global pandemic. Specifically, Watts distorted key government support programs during the pandemic by illegally obtaining government benefits through fraud and then used the proceeds for personal gain. Moreover, he repeatedly used the personal identifiable information ("PII") of multiple

---

[1] Pursuant to the government's recent motion for a preliminary order of forfeiture, the government is also asking for a forfeiture money judgement of $9,000. *See* ECF No. 253.

identity victims, including vulnerable victims, to perpetuate the fraud. As a result, one of his vulnerable victims could not collect needed support because of his and his co-conspirator's actions. ECF No. 217-1 at 3.

In March 2020, Congress passed the Coronavirus Aid, Relief, and Economic Security ("CARES") Act to provide emergency financial assistance to numerous Americans suffering from the economic consequences of the Coronavirus Disease 2019 ("COVID-19"). One way the CARES Act provided such assistance was by expanding a state's ability to provide unemployment insurance ("UI") benefits to those impacted by COVID-19, including self-employed workers or independent contractors, who were not typically eligible for such benefits.

While most individuals were sheltering in place, taking care of loved ones, and often making tough financial sacrifices, Watts, along with his co-conspirators, repeatedly took advantage of programs to assist those in need, during a global pandemic, and did so for their own selfish purposes. For approximately a one-year period, beginning in or about May 2020, Watts, along with his co-defendants, caused the submission of false and fraudulent UI applications that contained false and fraudulent representations concerning Identity Victims' contact information, addresses, employment status, work history, and eligibility for benefits. ECF 217-1 at 2. Specifically, Watts obtained PII, such as driver's licenses and Social Security cards, for Identity Victims and caused the submission of those false and fraudulent claims to the Maryland Department of Labor ("MD-DOL"). *Id.*

As an example of Watts' use of the Identity Victims' PII, on or about July 6, 2020, Watts sent Tyshawna Davis ("Davis") a picture containing the PII of Identity Victim 2 and two additional Identity Victims who were all clients of Organization 1.[2] His message made plain that

---

[2] Organization 1 is a Maryland-based organization that supports individuals with developmental, physical, and mental health disabilities. ECF No. 217-1 at 3.

he realized that these were real people, and that he was actively working to steal and use their identities. *See* Exhibit 1. Davis later confirmed to Watts, a/k/a "Free Lunch," that the fraudulent claim relating to Identity Victim 2 had gone through, and that the benefits intended for Identity Victim 2 were now available:



*See* Exhibit 2

Watts' criminal acts were not limited to obtaining PII or causing the submission of applications. Watts also affirmatively contacted the MD-DOL about the fraudulent applications, using his cell phone to inquire about the status of fraudulent claims. ECF No. 217-1 at 2. Moreover, he specifically engaged in obtaining the fraud proceeds, by using VISA prepaid cards loaded with MD-DOL benefits to engage in multiple ATM withdrawals. *Id.* at 3. Below is just one example when Watts withdrew funds at an ATM using a prepaid VISA debit card associated with an Identity Victim:



3

Perhaps most significantly, Watts' crime involved knowingly harming vulnerable victims through his aggravated identity thefts. In this way, Watts' criminal actions did not merely take advantage of just a COVID-19 program through fraud, but his actions also involved direct harm to some of the most vulnerable members of our society. On multiple occasions, Watts engaged in aggravated identity theft by using the PII of vulnerable victims dealing with mental health and cognitive impairment challenges. Specifically, Watts provided PII for victims associated with a Maryland-based organization that supports individuals with developmental, physical, and mental health disabilities. ECF No. 217-1 at 3. Further, on at least one occasion, an identity victim could not collect UI benefits after losing her job because of Watts' actions. *Id.*

For example, Identity Victim 2 worked at a grocery store from November 2019 to April 2022. ECF No. 217-1 at 3. Identity Victim 2 then lost her job and attempted to obtain UI benefits. *Id*. However, the MD-DOL deemed Identity Victim 2 was ineligible to receive benefits because of the fraud and aggravated identity theft committed by Watts and the other members of this conspiracy. *Id.* Specifically, the MD-DOL thought it had already paid Identity Victim 2 more than $10,000. *Id* at 2. Watts previously sent Identity Victim 2's PII to Davis, see Exhibit 1, so Davis texted Watts an update regarding Identity Victim 2's claim on July 11, 2020:



*See* Exhibit 2

In short, Watts was aware of these vulnerable victims when he obtained and provided their PII to Davis, and he nevertheless plowed along with his participation in this fraud.

Finally, Watts engaged in this massive fraud despite knowing that the MD-DOL and others were working to identify those scheming to unlawfully obtain Maryland UI benefits. *See* Exhibit 3. In July 2020, Watts sent Davis a message as follows:



Davis blithely dismissed this warning as "Negative Energy," and wrote in essence that she was shaking her head:



Watts did not heed the danger that his conduct posed, nor the risks that his criminal conduct would be uncovered. Instead, Watts and Davis continued their illegal conspiracy.

## II.     Procedural History & Applicable Guidelines

On May 8, 2025, the grand jury charged Watts in the Second Superseding Indictment with Conspiracy to Commit Wire Fraud, in violation of 18 U.S.C. § 1349 (Count 1), Wire Fraud, in violation of 18 U.S.C. § 1343 (Counts 3, 5, 6), and Aggravated Identity Theft, in violation of

5

18 U.S.C. § 1028A (Counts 13, 15). ECF No. 181. On October 6, 2025, Watts entered a guilty plea to Counts One and Fifteen of the Second Superseding Indictment. ECF No. 216.

The government agrees with the advisory guidelines calculation set forth in the Pre-Sentence Investigation ("PSI") prepared by U.S. Probation Office, which is consistent with the plea agreement herein. The PSI found that the base offense level for Count One is **7**, pursuant to U.S.S.G. § 2B1.1(a)(1). That offense level is further increased as follows:

- **10-level** increase because the loss is more than $150,000 but less than $250,000, pursuant to U.S.S.G. § 2B1.1(b)(1)(F);
- **2-level** increase because the offense involved sophisticated means, pursuant to U.S.S.G. § 2B1.1(b)(10)(C); and
- **2-level** increase because the defendant knew or should have known that at least one of the victims of the offense was a vulnerable victim, pursuant to U.S.S.G. § 3A1.1(b)(1).

Pursuant to U.S.S.G. § 3E1.1., the Defendant's offense level should then be reduced by three levels for acceptance of responsibility.

As to Count Fifteen, the PSI and the plea agreement set forth that this Court should impose a sentence of two years imprisonment, consecutive to any other period of incarceration, pursuant to 18 U.S.C. § 1028A and U.S.S.G. § 2B1.6. *See* PSI ¶ 47.

Accordingly, Watts should be sentenced based on an Offense Level of 18 and a Criminal History Category of II, which results in an advisory guidelines range for Count 1 of 30 to 37 months imprisonment.

### III. The Defendant's Serious Criminal Conduct, Criminal History, and The Other Appropriate Sentencing Factors Warrant 57 Months' Incarceration.

Watts' criminal conduct was serious, both in terms of the nature of the crime and its impact on the victims. This is not his first encounter with the criminal justice system, and his criminal history only reinforces the need for a significant period of incarceration. Finally, the

other sentencing considerations set forth in 18 U.S.C. § 3553(a) demonstrates the need for the government's total requested period of 57 months incarceration, including the need for punishment, the need to promote respect for the law, the need for general deterrence, and the need for specific deterrence.

    A.    Nature and Circumstances of the Defendant's Crimes.

As discussed above, Watts' crime is unquestionably serious and warrants significant punishment. He took advantage of a significant government program during the middle of the pandemic. He also engaged in repeated acts of identity theft to commit the crime and knowingly harmed vulnerable victims in the process. The vulnerable victims suffered from cognitive issues that require Courts such as this one to protect their interests by punishing admittedly culpable individuals such as Watts. Moreover, Identity Victim 2 was deprived of UI benefits when she eventually lost her employment at the grocery store. As discussed above, because of Watts' criminal conduct, the MD-DOL denied Identity Victim 2's UI claim in 2022. ECF No. 217-1 at 3. The harm to the vulnerable victims demonstrates that Watts' crime was not just about financial loss and false representations, but about a gross violation of the social contract that individuals should not take advantage of those less fortunate in our society. This crime requires – at a minimum – a lengthy period of incarceration in the top half of the applicable guidelines range.

Furthermore, the governing caselaw and federal statutes instruct sentencing courts not to reduce the appropriate sentence for other crimes, here Count One, based on the required mandatory minimum for aggravated identity theft, here Count Fifteen. *See* 18 U.S.C. § 1028A(b)(3) ("in determining any term of imprisonment to be imposed for the felony during which" the defendant used a means of identification, "a court shall not in any way reduce the

7

term to be imposed for such crime so as to compensate for, or otherwise take into account, any separate term of imprisonment imposed or to be imposed for a violation of this section"); *See also United States v. Yusef*, 781 Fed.Appx. 77, 80 (3rd Cir. 2019) (Court of Appeals found that the trial court improperly considered the two-year mandatory minimum sentence for aggravated identity theft in discounting the sentence it imposed for conspiracy following the defendant's convictions for conspiracy to commit wire fraud and aggravated identity theft).

    B.    The Defendant's History and Characteristics.

Although a defendant's personal history and characteristics typically weigh in favor of leniency, Watts has already had multiple prior encounters with the legal system, yet he proceeded with this criminal conduct. This Court's sentence should account for Watts' inability to obey the law, and the danger of recidivism he poses going forward.

The PSI sets forth that Watts should be sentenced based on a Criminal History Category of II. However, even this Criminal History Category understates his prior crimes because many of his prior convictions have "aged" out and do not count under the guidelines. But it should be plain that Watts has already had his first, second, and third chances with the criminal justice system.

In or about April 1999, Watts was convicted of a very serious crime, Robbery with a Deadly Weapon, and he was sentenced to an incarceration term of seven years, with five years and six months suspended. PSI ¶ 50. Violations of probation relating to this crime also resulted in probation being terminated unsuccessfully in 2003. *Id.* In or about September 2002, Watts was found guilty of Driving While Intoxicated and was sentenced to a 12-month suspended sentence. PSI ¶ 51. Again, the PSI shows indications that there were issues with his conduct while on probation. *Id*. Then, in or about December 2003, Watts had a probation before judgment relating

8

to a citation of a driver eluding uniformed police by fleeing. PSI ¶ 52. In or about February 2009, Watts was found guilty of driving without a license. PSI ¶ 53. In or about October 2013, Watts was found guilty of driving or attempting to drive while impaired by alcohol. PSI ¶ 54. The court sentenced Watts to one year incarceration, with 11 months of it suspended. *Id*. In or about August 2014, Watts was found guilty of driving while his license was suspended. PSI ¶ 55. In or about September 2015, Watts was again found guilty of driving without a license. PSI ¶ 56.

The government submits that Watts' criminal history demonstrates that his criminal conduct in this case is not an aberration. Instead, it represents a serious escalation of criminal conduct, which only further demonstrates the need for significant imprisonment.

    C.    The Other Sentencing Factors Reinforce The Need For A Total Sentence of 57 Months' Incarceration.

Finally, the government writes to briefly address the other factors that this Court should consider under 18 U.S.C. § 3553(a), namely the need for general deterrence, specific deterrence, avoiding unwarranted sentencing disparities, and to promote respect for the law. Economic crimes need to consider general deterrence because many white-collar criminals should have to consider the downsides of incarceration against the potential profit from fraud. *See United States v. Martin*, 455 F.3d 1227, 1240 (11th Cir. 2006) (internal citations omitted) ("Because economic and fraud-based crimes 'are more rational, cool and calculated than sudden crimes of passion or opportunity,' these crimes are prime candidates for general deterrence."); *United States v. Edwards*, 595 F.3d 1004, 1021 (9th Cir. 2010) (Bea, J., concurring) ("[B]ank fraud, unlike an assault in a tavern or even domestic abuse, tends to be a planned, deliberate crime, which allows plenty of time for reflection, calculation of the odds of success or failure, and the ultimate decision."). Here, a lengthy period of incarceration is supported by all those rationales.

The government also submits that Watts' criminal conduct warrants a similar punishment to the 57 months of incarceration that this Court already imposed on co-defendant Devante Smith ("Smith"). Smith's advisory guidelines range was very close to that of Watts' (overall range of 57-65 months), however, Smith's case did not warrant consideration of the harm suffered by vulnerable victims, and the painful denial of UI benefits to Identity Victim 2. As a result of that particularized harm, the government submits that a similar sentence of 57 months is more than appropriate despite the slight difference in their applicable advisory guidelines ranges.

### IV. Conclusion

For the reasons set forth above, the government submits that this Court should sentence Watts to a total of 57 months incarceration (33 months for Count One and 24 months consecutive for Count Fifteen), 3 years of supervised release, restitution of $167,775,[3] and a $200 special assessment. This sentence would be sufficient, but not greater than necessary, to comply with the sentencing factors set forth in 18 U.S.C. § 3553(a).

Respectfully Submitted,

Kelly O. Hayes
United States Attorney

*John D'Amico* (Digitally signed by JOHN D'AMICO Date: 2025.12.23 18:31:58 -05'00')

John M. D'Amico
Assistant United States Attorney
36 South Charles Street, Fourth Floor
Baltimore, Maryland 21201
410-759-0860
John.D'Amico@usdoj.gov

---

[3] Pursuant to 18 U.S.C. § 3663A, U.S.S.G. § 5E1.1, and the plea agreement in this case, the government asks that this Court award total restitution of $167,775, pursuant to sealed Exhibit 4. *See also* ECF No. 217 at 7. This restitution amount should be joint and several with all other defendants convicted in this case.